UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
DANIEL CASTRO-SANCHEZ,                   :
                         Plaintiff,      :
                                        :      10 Civ. 8314 (DLC)
            -v-                          :
                                        :      OPINION AND ORDER
NEW YORK STATE DEPARTMENT OF             :
CORRECTIONAL SERVICES, DEPARTMENT OF     :
MENTAL HEALTH, C.O. THORPE, C.O.         :
HANNAMAN, C.O. GUNSETT, C.O. WESLEY,     :
and C.O. LAMBERT,                        :
                         Defendants.     :
                                        :
----------------------------------------X


APPEARANCES:

For Plaintiff:

Daniel Castro-Sanchez, pro se
04-A-3037
Green Haven Correctional Facility
P.O. Box 4000
Stormville, NY 12582

For Defendants:

Steven N. Schulman
Assistant Attorney General
State of New York Office of the Attorney General
120 Broadway
New York, NY 10271


DENISE COTE, District Judge:

     Plaintiff pro se Daniel Castro-Sanchez brings this action

pursuant to 42 U.S.C. § 1983 against the New York State

Department of Correctional Services ("DOCS"),[1] the New York State Office of Mental Health ("OMH"), and Corrections Officers James Thorpe ("Thorpe"), Harold Hanaman (s/h/a "Hannaman"), Clifford Gunsett ("Gunsett"), George Wesley ("Wesley"), and McKenzie R. Lambert ("Lambert").  The plaintiff, an inmate at Green Haven Correctional Facility ("Green Haven"), alleges that the individual defendants violated his constitutional rights by, inter alia, refusing him medical and psychiatric care, retaliating against him for the filing of grievances, and using excessive force against him.  The plaintiff also seeks an injunction against DOCS and OMH that would force these state agencies to comply with recent New York legislation relating to the training and supervision of correctional officers handling mental health inmates.

The defendants have moved to dismiss the complaint, arguing that the plaintiff has failed to exhaust available administrative remedies with respect to some of his claims, and that for others he has failed to state a claim upon which relief may be granted.  For the following reasons, the motion to dismiss is granted in part.

---

[1] The DOCS has merged with the Division of Parole and been renamed the Department of Corrections and Community Supervision. This Opinion will continue to refer to the department by its previous acronym.

Background

The following facts are taken from the plaintiff's complaint or documents integral to it unless otherwise noted, and are taken to be true for purposes of this motion. LaFaro v. New York Cardiothoracic Group, PLLC, 570 F.3d 471, 475 (2d Cir. 2009). In deciding a motion to dismiss, a court may consider "any written instrument attached to [the complaint] as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are integral to the complaint." Sira v. Morton, 380 F.3d 57, 67 (2d Cir. 2004) (citation omitted). The plaintiff has attached to his complaint "all my grievances, complaints and appeals in chronological order" that he claims support the allegations in the complaint, as well as his assertion that he has exhausted all administrative remedies available to him. The defendants seek to supplement the record with additional information about the outcome of several of the plaintiff's appealed grievances. The defendants' submissions fill the gaps in the documentation the plaintiff has provided. Accordingly, all of these documents submitted by the defendants are properly considered in connection with defendants' motion to dismiss without converting the motion to one for summary judgment. See Ortiz v. McBride,

380 F.3d 649, 653 (2d Cir. 2004) (treating failure to exhaust issue as one properly raised under 12(b)(6)).[2]


I.  Plaintiff's Claims against the Individual Defendants

     The plaintiff is part of Green Haven's Transitional Intermediate Care Program ("TRICP") for patients receiving mental health care.  He is housed in gallery A-3 with other TRICP inmates.  The plaintiff's primary language is Spanish, and he has a very limited understanding of English.  The individual defendants are correctional officers who work as guards in A-3.

     From January 30 to September 20, 2010, the plaintiff filed a series of grievances against the individual defendants. According to the plaintiff, the acts underlying the later grievances were committed at least in part to retaliate against the plaintiff for his initial grievance regarding events occurring on January 30.  The plaintiff also alleges, more generally, that he was singled out because of his limited English language abilities and that there is a pattern of abuse by corrections officers directed at "mental health inmates in this block".

---

[2] If it were necessary to convert the motion to one for summary judgment, it would be appropriate to do so here.  The plaintiff has been given adequate notice that the defendants have submitted documents to complete the record that the plaintiff has himself sought to make.  Hernandez v. Coffey, 582 F.3d 303, 307 (2d Cir. 2009).

A. January 30, 2010 Strip Frisk

The plaintiff's initial grievance, GH-69019-10,[3] recounts an incident that occurred on January 30, 2010.  As the plaintiff prepared to head to the yard for recreation, Thorpe ordered him to wait until recreation was finished.  Thorpe then ordered the plaintiff to empty his pockets and place his hands on the wall.  Thorpe proceeded to aggressively pat down the plaintiff, then pulled down the plaintiff's pants and "touched [plaintiff's] intimate parts . . . including [plaintiff's] buttocks[.]"[4] Hannaman approached the pair while the pat-down was occurring.  Two of the items that the plaintiff had removed from his pockets were a pack of cigarettes and a lighter.  After the pat-down concluded, the plaintiff asked if he could retrieve these items.  Hannaman told the plaintiff that he could not; these items were "lost".  The plaintiff did not receive a contraband receipt for these confiscated items.

Thorpe then began to speak about another inmate, Santos Franco.  While the plaintiff could not understand the majority of what Thorpe sought to convey, the plaintiff took the

_____

[3] A date on the English version of the grievance indicates that the translation from Spanish to English was performed on February 16, 2010.

[4] While the plaintiff's initial grievance merely states that Thorpe touched the plaintiff's "intimate parts," the plaintiff's complaint alleges that Thorpe "fondled" the plaintiff's genitals.

conversation to mean that Thorpe was upset at Franco and sought to "send Franco a message through [the plaintiff][.]"  The plaintiff later confirmed with Franco that Franco had had numerous run-ins with Thorpe.

Green Haven Superintendent William Lee ("Lee") denied the plaintiff's grievance on July 28, 2010, stating that the allegations could not be substantiated and Thorpe denied that a "pat frisk" had taken place.  The plaintiff appealed the denial of his grievance to the Inmate Grievance Program's ("IGP") Central Office Review Committee ("CORC") on August 9, 2010. CORC denied the plaintiff's appeal on October 20, 2010.

B. February 3, 2010 Refusal to Release for Medication

The plaintiff's next grievance, GH-69105-10, is dated February 25, 2010, and concerns events that took place on February 3.  According to plaintiff, Lambert failed to release the plaintiff from his cell at an appointed time for a scheduled medication run.  Early in the morning of February 3, Lambert made the rounds of the cellblock, and the plaintiff put his name on the list of inmates to be released for a 7 a.m. medication run.  Fifteen minutes later, Lambert opened cells but skipped the plaintiff's.  The plaintiff called out to a neighboring inmate, Billy Rivera ("Rivera"), to remind Lambert that the plaintiff's cell had been skipped.  Lambert, however, told Rivera that the plaintiff had not put his name down for the

medication run.  Although Rivera remonstrated with Lambert that the plaintiff was sick and needed to take medication, Lambert still refused to release the plaintiff from his cell.  The CORC denied the plaintiff's grievance appeal on July 7, 2010.

C. February 16, 2010 Denial of "Medical Keeplock"

The plaintiff filed his next grievance, GH-69189-10, on March 8, 2010, concerning events occurring from February 16 to 18.  On February 16, plaintiff was attending the TRICP program when he began to feel unwell.  He told the staff member running the program (who is referred to by the plaintiff as "Miss Jacqueline"), who notified a corrections officer.  That officer gave the plaintiff an emergency pass for the medical clinic.  A doctor at the clinic gave the plaintiff a permit that would allow the plaintiff to remain in his cell on "medical keeplock."[5] Arriving back at his cellblock, the plaintiff gave the permit to the officer on duty, who recorded the plaintiff (apparently mistakenly) as on regular, as opposed to medical, keeplock.

That same day, the plaintiff's access to a scheduled psychological services unit ("PSU") call-out was denied by Wesley, on account of the plaintiff's erroneously recorded "regular" keeplock status.  Hannaman, Wesley's superior, also

---

[5] Keeplock is a form of administrative segregation in which the inmate is confined to his cell, deprived of participation in normal prison routine, and denied contact with other inmates. Peralta v. Vazquez, 467 F.3d 98, 103 n.6 (2d Cir. 2006).

refused to let the plaintiff go to the PSU call-out after the plaintiff appealed to him.  Because of his erroneously recorded keeplock status, the plaintiff was denied access to the commissary on February 16 and his medication runs on February 16 and 17.  The plaintiff does not indicate of what medication(s) he was deprived.  The keeplock period ended on February 18, when the plaintiff was allowed to go on his regular medication run.

Superintendent Lee denied the plaintiff's grievance on July 28, 2010.  The appeal statement on the denial of grievance form is blank,[6] and CORC's custodian of records avers that CORC has no record of an appeal of GH-69189-10.

D. March 11, 2010 Threats and Denial of PSU Call-Out

Although he does not specifically mention the incidents in his complaint or accompanying Statement of Facts, the plaintiff has attached a March 29, 2010 grievance, GH-69325-10, relating events of March 11, 2011.  The allegations contained therein will be considered incorporated into the plaintiff's complaint.

For several days prior to March 11, 2011, English-speaking inmates in the plaintiff's cellblock had been warning the plaintiff, through interpreters, that Thorpe, Wesley, Hannaman, and other corrections officers were actively discussing the

---

[6] IGP notices indicating the superintendent's grievance action include a form with space for an inmate to fill in their "Appeal Statement."  An inmate wishing to appeal the superintendent's decision to the CORC must fill in the form within seven days of receipt and return it to his Inmate Grievance Clerk.

plaintiff and threatening to "break [him] up."  On the morning
of March 11, the plaintiff was returning to his cell from a
medication run when he noticed Thorpe trailing him.  Thorpe
confronted the plaintiff when they reached the plaintiff's cell.
Standing directly in front of the plaintiff's cell, Thorpe
clenched his fists and began speaking in English.  The plaintiff
understood only a limited amount of what Thorpe said, but did
hear Thorpe refer to a grievance and the plaintiff's fellow
inmate Franco.  The plaintiff then heard Thorpe say,
"motherfucker, Puertorican [sic]", after which Thorpe "grabbed
his crotch area[,] saying 'for you.'"  Later that day, another
inmate told the plaintiff to be careful because Thorpe and
Wesley had been overheard talking about him, with one saying,
"[T]hat damn Puertorican [sic], he's going to pay for having
written a grievance."[7]

---

[7] The plaintiff has also attached a copy of a letter sent on
March 11 to "Ms. Jacquelonie, PSU".  The letter indicates that
it is a translation by another inmate of the original Spanish
version of the letter written by the plaintiff.  The letter
contains essentially the same specific allegations of threats by
Thorpe and Wesley as GH-69325-10.  Unlike the grievance,
however, the letter states that the plaintiff "fear[s] for [his]
life with these officers, and [he doesn't] want them to beat
[him] up and then say [the plaintiff] assaulted them in any
mannerform [sic] or fashion, as this is their habit after they
beat someone up."  The letter also relays the plaintiff's belief
that "about two years ago, Officer Thorpe beat someone to death
in A-Block."

At "count time", the plaintiff asked Lambert whether the plaintiff had a PSU call-out scheduled.  According to the plaintiff, "Ms. Jacquelonie"[8] had told him that he had an emergency PSU call-out scheduled for that afternoon.  Lambert, however, told the plaintiff that there was no such call-out scheduled, and therefore logged the plaintiff for an afternoon gym call-out.  When "Ms. Jacquelonie" called the corrections officers on the plaintiff's cellblock to have him produced at the PSU, the plaintiff claims that the officers "lied to her."

Grievance GH-69325-10 was denied by Superintendent Lee on July 9, 2010.  The plaintiff appealed to CORC, which denied the appeal on September 15, 2010.

E. June 18, 2010 Assault

In the Statement of Facts attached to his complaint, the plaintiff states that he was "punched in [his] face by C.O. Hannaman without provocation[.]"  In support of his complaint, the plaintiff has attached grievance GH-69880-10, alleging events occurring on June 18, 2010.

On June 18, the plaintiff was returning to his cell from a morning medication run.  He encountered Wesley, who instructed the plaintiff to position himself on the wall for a pat frisk. After Wesley finished frisking the plaintiff, he "grab[bed the

---

[8] This is presumably the same "Miss Jacqueline" referred to in plaintiff's GH-69189-10 grievance.

plaintiff] by the neck and presse[d] [the plaintiff's] face on the wall really hard." Hannaman then left his post, came over to the plaintiff's side, and began speaking to the plaintiff in an aggressive manner. While the plaintiff could not understand much of what was being said, he did understand Hannaman to say that the plaintiff should not "grieve anything that goes on in his block." Hannaman then punched the plaintiff in the face, and stated, "[T]hat's for all the grievances[.]"

In the same grievance, GH-69880-10, the plaintiff also states that the officers in question "are more incline[d] to harass Latinos." He states that he is forced to speak English, which he cannot do, and that he has frequently requested an interpreter, a request that has been denied. The plaintiff concludes the grievance by requesting a transfer to a different housing unit.

Superintendent Lee denied GH-69880-10 on September 13, 2010, finding that the plaintiff had refused to participate in a full investigation of the grievance. The plaintiff appealed to CORC on September 17, 2010. He requested that a "proper investigation" be carried out, claiming that photos had been taken of the incident. On November 24, the CORC accepted the grievance only to the extent that it called for an investigation of the incident; noting that Green Haven had in fact "conducted a proper investigation," the CORC upheld the Superintendent's

determination.  This had the practical effect of denying the
plaintiff's grievance appeal.[9]

     F.  June 28, 2010 Threats

     The plaintiff filed grievance GH-69921-10 on July 13, 2010,
relating to events that the plaintiff alleges occurred on June
28, 2010.  At noon on June 28, the plaintiff presented a pass to
Thorpe upon the plaintiff's return to his cellblock from the
medical clinic.  Thorpe took the pass, began to mock the
plaintiff, and ordered him to wait.  The plaintiff was made to
wait until he "became the last person in the company."  At that
point, Thorpe became hostile, and proceeded to berate the
plaintiff.  The plaintiff could not understand most of what was
said.  That evening, an inmate named Lee Hernandez ("Hernandez")
approached the plaintiff in the yard.  Hernandez translated what
Thorpe had said.[10]  According to Hernandez, Thorpe had warned the

_____

[9] The plaintiff has also attached to the complaint a letter he
received from a representative of Superintendent Lee on
September 21, 2010.  The letter appears to refer to the alleged
assault that the plaintiff claims occurred on June 18, although
it refers to the plaintiff's "claim of being assaulted by Staff
on June 15, 2010."  According to Superintendent Lee's
representative, a Sergeant at Green Haven investigated the
plaintiff's allegations and concluded that while "something did
happen [sic] to [the plaintiff], perhaps an altercation with
another inmate," the Sergeant did not believe that Green Haven
staff was involved.  The letter states that the Sergeant offered
the plaintiff the option of protective custody, which the
plaintiff declined.

[10] The assertion that Hernandez told the plaintiff what Thorpe
said appears at odds with the statement earlier in the grievance

12

plaintiff that Thorpe was "going to make [the plaintiff] pay"
for the grievance, and that Thorpe was going to "get some of the
other officers [the plaintiff] submitted other grievances on[.]"
The latter statement was presumably a warning that Thorpe would
seek to organize other corrections officers to conspire against
the plaintiff.  Hernandez told the plaintiff that Thorpe would
soon seek to plant a knife and drugs in the plaintiff's cell,
and "eliminate [the plaintiff] some way some how."  In the same
grievance, the plaintiff states that he is a psychiatric
patient, that he had previously been recuperating and his
situation had been improving, but recent events have left him
"suffering with nervous attacks, that are uncontrollable."

The plaintiff has not attached any record of the
disposition of grievance GH-69921-10 to his complaint.  CORC has
no record of appeal of GH-69921-10.

G. Confiscation of Kosher Meals

The plaintiff's complaint states that Thorpe is
"responsible for the taking of my Jewish Kosher diet meals[.]"
On August 23, 2010, the plaintiff filed grievance GH-70125-10,
stating that Thorpe "has illegally been taking my religious
meals (Jewish), which is [sic] my Kosher diet[.]"  The grievance
states that Thorpe first did so on July 31, 2010, and has

---

that the plaintiff was made to wait until he was alone with
Thorpe.

continued to do so up to the filing date.  According to the plaintiff, "[t]his C.O., in other circumstance [sic] has persecuted and retaliated because of various grievances I have put on him."

Superintendent Lee denied GH-70125-10 on September 23, 2010, and the plaintiff appealed on September 29.  CORC denied the plaintiff's appeal on December 15, 2010.

H.  August 7, 2010 Threats and Self-Mutilation

On September 20, 2010, the plaintiff filed the last grievance attached to his complaint ("the September 20 Grievance").[11]  The complaint itself discusses the events underlying the September 20 Grievance in some detail.

According to the plaintiff, on August 7, 2010, Gunsett approached the plaintiff's cell and began to harass and threaten him.  Gunsett stated, in sum and substance, that "if [the plaintiff did] not stop writing up grievances on his fellow officer's [sic], that something bad was going to happen to me." Another inmate in a neighboring cell overheard the exchange, during which Gunsett threatened the plaintiff three times. After and as a result of the encounter, the plaintiff was "so distraught and fearful" that Gunsett and other officers would isolate the plaintiff from other inmates and assault the

---

[11] The plaintiff's original Spanish-language grievance is attached to the complaint.  An incomplete English translation is also attached.

14

plaintiff when he left his cell for medication that he "took a sharp can top and deeply cut into my arm[.]"  The plaintiff's self-mutilation required outside medical treatment and stitches to his arm.

On October 6, 2010, Superintendent Lee's representative notified the plaintiff that the September 20 Grievance would be consolidated with the previously filed grievance GH-69921-10.[12] As previously noted, CORC has no record of an appeal of GH-699210-10.

## II. Plaintiff's Claims against the Agency Defendants

In addition to his § 1983 claims against the individual defendants, the plaintiff brings claims against DOCS and OMH, both New York state agencies, for injunctive relief.  Broadly construing the complaint, the plaintiff seeks to bring claims against DOCS and OMH under § 1983, the Americans with Disabilities Act ("ADA"), and the New York State Correction Law ("Correction Law"), alleging that DOCS and OMH have failed to implement provisions of the Correction Law relating to the training and supervision of corrections officers in the handling of inmates with mental health problems.

---

[12] GH-699210-10 related to alleged threats made by Thorpe to the plaintiff on July 28, 2010.

15

In his complaint, plaintiff requests the following relief
with respect to the agency defendants:

> I am seeking an [sic] Judicial Injunctive relief
> against [DOCS] and [OMH], for the ongoing illegal
> practices of Constitutional abuse of me being an [sic]
> mental health inmate who is being arbitrarily and
> capriciously harassed, threatened, and physically
> assaulted by correction officers, who are not trained
> under the mental health hygiene law passed in 2008,
> and who all have a documented history of having a
> propensity to use violence and physical force against
> predominant mental health inmates who are housed in A-
> block 3-company.

The plaintiff's requested injunctive relief would "mandate

[DOCS] and [OMH] remain in compliance with providing these

abusive officers with the required training under [the

Correction Law][.]"


Procedural History

The plaintiff's complaint, dated October 14, 2010, was

received by the District's Pro Se Office on October 26 and filed

that same day.  The defendants' motion to dismiss was filed on

May 18, 2011.  The plaintiff requested and was granted two

extensions of time to file an amended complaint or to oppose the

motion to dismiss.  On June 30, the Court ordered that the

plaintiff must serve his amended complaint or opposition by

August 12, and stated that there would be no further extensions

of this deadline.  As of this date, the plaintiff has submitted

16

neither an amended complaint nor opposed the defendants' motion
to dismiss.

## Discussion

The defendants move under Fed. R. Civ. P. 12(b)(6) to
dismiss the plaintiff's complaint on two grounds.  First, they
contend, pursuant to the Prison Litigation Reform Act of 1995
("PLRA"), that the plaintiff has failed to exhaust all
administrative remedies available to him as to several of the
injuries alleged.  Second, they argue that plaintiff's remaining
claims, including those against the agency defendants, fail as a
matter of law.

## I. Exhaustion of Administrative Remedies

The defendants have moved to dismiss seven of the
plaintiff's claims on the grounds that the plaintiff failed to
exhaust all administrative remedies prior to filing suit.  The
claims that the defendants argue the plaintiff failed to exhaust
are those arising out of (1) the January 30 strip frisk (GH-
69019-10); (2) the February 16 denial of medical keeplock (GH-
69189-10); (3) the June 18 assault (GH-69880-10); (4) the June
28 harassment and threats (GH-69921-10); (5) the taking of
Kosher meals, beginning July 31 and continuing until at least
August 23 (GH-70125-10); and (7) the August 7 harassment

precipitating self-mutilation (the September 20 Grievance, consolidated with GH-69921-10).  The defendants' motion to dismiss for failure to exhaust all available administrative remedies is granted with respect to three of the plaintiff's claims listed above.

The PLRA, 110 Stat. 1321-71, as amended, 42 U.S.C. § 1997e et seq., requires a prisoner to exhaust all available administrative remedies before he can bring a civil rights action pursuant to 28 U.S.C. § 1983.  See 42 U.S.C. § 1997e(a);[13] Woodford v. Ngo, 548 U.S. 81, 93 (2006); Hernandez, 582 F.3d at 305.  "[F]ailure to exhaust is an affirmative defense in a lawsuit governed by the PLRA."  Johnson v. Rowley, 569 F.3d 40, 45 (2d Cir. 2009) (citing Jones v. Bock, 549 U.S. 199, 216 (2007)).  As a preliminary matter, dismissal may be granted at the pleading stage for failure to exhaust if the defense, like other affirmative defenses, "appears on the face of the complaint."  Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 74 (2d Cir. 1998).

"Exhaustion is 'mandatory' and 'applies to all inmate suits about prison life, whether they involve general circumstances or

_____

[13] The PLRA's exhaustion requirement states: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).

particular episodes.'" Hernandez, 582 F.3d at 305 (quoting
Porter v. Nussle, 534 U.S. 516, 524 (2002)). "[R]etaliation
claims fit within the category of inmate suits about prison
life, and therefore must be preceded by the exhaustion of state
administrative remedies available." Ziemba v. Wezner, 366 F.3d
161, 163 (2d Cir. 2004) (citation omitted). "Section 1997e(a)
requires 'proper exhaustion,' which 'means using all steps that
the agency holds out, and doing so properly (so that the agency
addresses the issues on the merits).'" Hernandez, 582 F.3d at
305 (quoting Woodford, 548 U.S. at 90). Where the prison's
procedures permit appeal of an adverse ruling, to exhaust the
available procedures a prisoner must file an appeal. Woodford,
548 U.S. at 90.

> DOCS' IGP
>
> has a regular three-tiered process for adjudicating
> inmate complaints: (1) the prisoner files a
> grievance with the Inmate Grievance Resolution
> Committee ("IGRC"), (2) the prisoner may appeal an
> adverse decision by the IGRC to the superintendent
> of the facility, and (3) the prisoner then may
> appeal an adverse decision by the superintendent to
> the Central Officer Review Committee ("CORC").

Espinal v. Goord, 554 F.3d 216, 224 (2d Cir. 2009). Pursuant to
state regulation, where an inmate grieves alleged harassment by
prison staff, the grievance is subject to an expedited
procedure. The inmate's grievance skips the IGRC and goes
directly to the superintendent. Appeal from the

superintendent's resolution of the grievance goes to the CORC.
See 7 NYCRR § 701.8.

    As noted above, the plaintiff signed his complaint on
October 14, 2010.  The plaintiff also certified under penalty of
perjury that on the same day he delivered the complaint to
prison authorities to be mailed.  An inmate's complaint is
considered filed on the date that it is "delivered to prison
officials for transmittal to the court."  Dory v. Ryan, 999 F.2d
679, 682 (2d Cir. 1993).

    Several of the plaintiff's grievances were denied by the
CORC after October 14, 2010, the date on which the plaintiff
filed his complaint.  These include the plaintiff's grievance
GH-69019-10, alleging an abusive and retaliatory strip frisk on
January 30; the plaintiff's grievance GH-69980-10, alleging an
assault by Wesley and Hannaman on June 18; and the plaintiff's
grievance GH-70125-10, alleging confiscation of the plaintiff's
Kosher meals from July 31 to August 23.  If the plaintiff had
filed the amended complaint, as permitted by the Court, that
pleading would have been filed after the completion of the
grievance process for each of these three grievances.  They are
therefore deemed exhausted.

    The plaintiff did not appeal three of his grievances to the
CORC after they were denied by Green Haven's Superintendent.
These include GH-69015-10, alleging that Lambert refused to

allow the plaintiff to take a scheduled medication run on
February 16, and the two grievances consolidated into GH-69921-
10, concerning the harassment by Thorpe on June 28, and by
Gunsett on August 7.  Appeal to the CORC is a mandatory step in
the exhaustion of available administrative remedies, and a
necessary precursor to filing a § 1983 suit against prison
officials.  Accordingly, the plaintiff's claims arising out of
these three events are dismissed for failure to exhaust
available administrative remedies.


II.  Legal Insufficiency

     The defendants also argue that the majority of the
plaintiff's claims fail as a matter of law, and must therefore
be dismissed even if the plaintiff properly exhausted all
administrative remedies prior to bringing these claims.  "Under
Federal Rule of Civil Procedure 8(a)(2), a pleading must contain
a 'short and plain statement of the claim showing that the
pleader is entitled to relief.'"  Ashcroft v. Iqbal, 129 S. Ct.
1937, 1949 (2009).  To survive a motion to dismiss, "a complaint
must contain sufficient factual matter, accepted as true, to
state a claim to relief that is plausible on its face."  Id.
(citation omitted).

          The plausibility standard is not akin to a
          probability requirement, but it asks for more than a
          sheer possibility that a defendant has acted

> unlawfully.  Where a complaint pleads facts that are
> merely consistent with a defendant's liability, it
> stops short of the line between possibility and
> plausibility of entitlement to relief.

Id.  Applying this plausibility standard is "a context-specific
task that requires the reviewing court to draw on its judicial
experience and common sense."  Id. at 1950.  "To survive
dismissal, the plaintiff must provide the grounds upon which his
claim rests through factual allegations sufficient to raise a
right to relief above the speculative level."  ATSI Commc'ns,
Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

When considering a motion to dismiss under Rule 12(b)(6), a
trial court must "accept all allegations in the complaint as
true and draw all inferences in the non-moving party's favor."
LaFaro, 570 F.3d at 475.  Moreover, pleadings filed by pro se
plaintiffs are to be construed liberally.  Chavis v. Chappius,
618 F.3d 162, 170 (2d Cir. 2010) (citation omitted).  The rule
favoring liberal construction of pro se submissions is
especially applicable to civil rights claims.  See Weixel v. Bd.
of Ed. of the City of New York, 287 F.3d 138, 146 (2d Cir.
2002).  A complaint must do more, however, than offer "naked
assertions devoid of further factual enhancement," and a court
is not "bound to accept as true a legal conclusion couched as a
factual allegation."  Iqbal, 129 S. Ct. at 1949-50.
Accordingly, a court may disregard "threadbare recitals of a

cause of action's elements, supported by mere conclusory
statements." Id. at 1940.

    A. January 30, 2010 Strip Frisk

    The plaintiff claims that he was subjected to a highly
invasive pat-frisk on January 30, 2010, during which his pants
were pulled down and his "intimate parts" were touched by
Thorpe.  In addition to this Fourth Amendment violation, the
plaintiff also alleges a retaliatory motive for the search.
Finally, the plaintiff alleges that his due process rights were
violated when he was deprived of his personal property after the
search concluded.

    Routine random strip searches of inmates, including body
cavity inspections, do not violate the Fourth Amendment.  See
N.G. v. Connecticut, 382 F.3d 225, 232 (2d Cir. 2004); Covino v.
Patrissi, 967 F.2d 73, 77-80 (2d Cir. 1992).  Thus, to the
extent that the plaintiff alleges that he was subjected to a
random, routine strip frisk on January 30 while returning to his
cell, the claim is dismissed.

    The legal standards for a prisoner's retaliation claim are
described below.  While the plaintiff posits a retaliatory
motive for the strip frisk, namely Thorpe's desire to "send [the
plaintiff's fellow inmate] Franco a message through [the
plaintiff]", grievance GH-69019-10 makes clear that the
plaintiff inferred a retaliatory motive solely based upon Thorpe

mentioning Franco's name after the strip frisk.  The grievance
is equally clear that the plaintiff did not understand what
Thorpe said, because Thorpe said it in English.  This is
insufficient to raise the plaintiff's claim of a retaliatory
motive beyond the realm of speculation and render it plausible.

The plaintiff also claims that following the strip frisk,
his cigarettes and lighter were confiscated by Hannaman and
never returned to him.  "[T]he existence of an adequate state
remedy to redress property damage inflicted by state officials
avoids the conclusion that there has been any constitutional
deprivation of property without due process of law within the
meaning of the Fourteenth Amendment."  Parratt v. Taylor, 451
U.S. 527, 542 (1981) (citation omitted), overruled in part on
other grounds, Daniels v. Williams, 474 U.S. 327, 330-31 (1986).
When an adequate state remedy exists for loss of property,
therefore, an inmate may not pursue damages through a § 1983
claim.  Morello v. Smith, 810 F.2d 344, 347 (2d Cir. 1987).  The
New York Court of Claims Act provides Lombardo with a cause of
action against the State for this tort.  See N.Y. Ct. of Claims
Act § 9; see also Brown v. State, 674 N.E.2d 1129, 1133-34 (N.Y.
1996).  The plaintiff has not provided any argument that the New
York State remedy is not adequate.  The plaintiff's claims
arising out of the January 30, 2010 incident are therefore
dismissed.

24

B.  Denial of Medical and Psychiatric Care

The plaintiff alleges that on February 3 and March 11, 2010, Lambert denied him access to medical and psychiatric care in violation of the Eighth Amendment.[14]  The defendants move to dismiss the plaintiff's claims of deliberate indifference to his medical needs.

Although the Eighth Amendment imposes a duty upon prison officials to ensure that inmates receive adequate medical care, it is well-established that "not every lapse in medical care is a constitutional wrong." Salahuddin v. Goord, 467 F.3d 263, 279 (2d Cir. 2006) (citation omitted).  Rather, a prison official is held to have violated the Eighth Amendment only when the alleged deprivation is shown to be "sufficiently serious" and the prisoner demonstrates that the charged official acted "with a sufficiently culpable state of mind." Id. at 279–80 (citation omitted).

To determine whether a deprivation of medical care is "sufficiently serious," a court must first ask "whether the prisoner was actually deprived of adequate medical care." Id. "As the Supreme Court has noted, the prison official's duty is only to provide reasonable care." Id. (citing Farmer v. Brennan, 511 U.S. 825, 844–47 (1994)).  An inmate is not

---

[14] The claim that Wesley and Hannaman denied the plaintiff access to medication on February 16, 2010, has been dismissed for the plaintiff's failure to exhaust his administrative remedies.

entitled to treatment by every available medical alternative as long as his treatment is reasonable.  Estelle v. Gamble, 429 U.S. 97, 107 (1976).  Furthermore, a "mere disagreement over the proper treatment does not create a constitutional claim.  So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."  Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir. 1998).

A court must also inquire as to "how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner."  Salahuddin, 467 F.3d at 280 (citation omitted).  If the inadequacy at issue is "a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's [underlying] medical condition is sufficiently serious."  Id.  If, however, "the inadequacy is in the medical treatment given, the seriousness inquiry is narrower."  Id.  Then, "it's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes."  Smith v. Carpenter, 316 F.3d 178, 186 (2d Cir. 2003).  Even in cases where an inmate "suffers from an admittedly serious medical condition," if the alleged deficiencies in treatment are "minor and inconsequential," those

lapses will not sustain an Eighth Amendment claim.  Id.  "[T]he actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm."  Id. at 187.

The second requirement for an Eighth Amendment violation is subjective: the prison official must act with a "sufficiently culpable state of mind."  Salahuddin, 467 F.3d at 280 (citation omitted); see also Caiozzo v. Koreman, 581 F.3d 63, 71 (2d Cir. 2009).  "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law."  Salahuddin, 467 F.3d at 280 (citation omitted).  "This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result."  Id. (citation omitted).  This means that the prison official "must be subjectively aware that his conduct creates such a risk."  Id. at 281 (citation omitted).

The plaintiff fails to state a claim under either element of a deliberate indifference claim.  For the February 3, 2010 incident, the plaintiff omits any description of the medical condition for which he had been prescribed medication, as well as the medication itself.  Nor is there any mention of the medical consequences to the plaintiff from missing his February 3 medication run.  The plaintiff, in short, has not alleged that

missing the medication run had anything more than a de minimis effect on his health.  Nor has he pleaded facts sufficient to state a claim that Lambert had a culpable state of mind when he refused to release the plaintiff for the medical run.

The plaintiff has also failed to plead a plausible claim of deliberate indifference with respect to the March 11, 2010 denial of the plaintiff's PSU call-out by Lambert.  The plaintiff has not alleged any specific psychiatric consequences arising out of missing his PSU call-out on that date.  Nor do the facts alleged give rise to a plausible inference that Lambert acted with a culpable state of mind, or with retaliatory motive.  While inmates reported hearing other corrections officers discussing harm to the plaintiff on that day, Lambert was not among these officers.  The plaintiff's deliberate indifference claims, arising out of the events of February 3 and March 11, 2010, are therefore dismissed.

C. Retaliation

In his complaint, the plaintiff states that "[s]ince January 30, 2010, when I filed a grievance complaint against C.O. Thorpe, I have been the arbitrary target of this Officer, as well as the other named Officer's . . . by their continuing threats, harassment [and] physical assaults in retaliation [for] the filing of this initial grievance complaint[.]"  The plaintiff brings retaliation claims against the individual

28

defendants arising out of the incidents his grievances describe occurring on February 3, March 11, June 18, and July 31, 2010.[15] The defendants argue that all of the plaintiff's retaliation claims, with the exception of those arising out of the June 18 and July 31 incidents, fail as a matter of law.

"To prove a First Amendment retaliation claim under Section 1983, a prisoner must show (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." Espinal v. Goord, 558 F.3d 119, 128 (2d Cir. 2009) (citation omitted).  The First Amendment protects prisoners from retaliation for filing grievances.  See Davis v. Goord, 320 F.3d 346, 352 (2d Cir. 2003); Graham v. Henderson, 89 F.3d 75, 80 (2d Cir. 1996).

"Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation."  Davis, 320 F.3d at 353 (citation omitted).  "Otherwise the retaliatory act is simply de minimis and therefore outside the ambit of constitutional protection." Id. (citation omitted).  "In making this determination, the

---

[15] Similar claims concerning incidents on February 16, June 28, and August 7, 2010, have been dismissed for the plaintiff's failure to exhaust his administrative remedies.

court's inquiry must be tailored to the different circumstances in which retaliation claims arise, bearing in mind that prisoners may be required to tolerate more than average citizens, before a retaliatory action taken against them is considered adverse." Id. (citation omitted). "[T]his objective test applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." Gill v. Pidlypchak, 389 F.3d 379, 381 (2d Cir. 2004).

The plaintiff has failed to state a retaliation claim arising out of the February 3 and March 11 incidents. The plaintiff's grievance GH-69105-10, alleging that Lambert refused to permit the plaintiff to go on his "medication run" on February 3, does not suggest any retaliatory motive on Lambert's part. As for Lambert's actions on March 11, the plaintiff does allege that he had been hearing rumors for several days that specified officers -- Thorpe, Wesley, and Hannaman -- were conspiring to "break [him] up." Lambert, however, was not among these conspirators. Nor are Lambert's actions alleged to have anything to do with the assault that the other corrections officers were planning against the plaintiff. The defendants are therefore correct that the plaintiff has failed to allege that Lambert acted with any retaliatory motive.

30

The defendants also move to dismiss the plaintiff's claims arising out of his encounter with Thorpe on March 11.  The plaintiff claims that on March 11 Thorpe followed him to his cell and began berating him.  Thorpe allegedly used the words, "motherfucker, Puertorican [sic]" and grabbed his own crotch area, stating "for you."  "Insulting or disrespectful comments directed at an inmate generally do not rise to th[e] level" of an adverse action sufficient to establish a constitutional violation.  <u>Davis</u>, 320 F.3d at 353; <u>see also</u> <u>Mateo v. Fischer</u>, 682 F.Supp.2d 423, 434 (S.D.N.Y. 2010) ("The less direct and specific a threat, the less likely it will deter an inmate from exercising his First Amendment rights.").  Thorpe's alleged conduct on March 11, while certainly improper, does not constitute a sufficiently serious and concrete threat to be actionable.

D. Plaintiff's Claims against the Agency Defendants

The plaintiff seeks injunctive relief against DOCS and OMH, to force these state agencies to comply with New York state law in the training and supervision of corrections officers working in close proximity to mental health inmates.  The defendants move to dismiss the plaintiff's claims against DOCS and OMH, arguing that they fail as a matter of law.  The defendants' motion is granted in part.

31

Broadly construed, the plaintiff brings claims under § 1983, the ADA, and New York state law.  The Supreme Court has held, as a matter of statutory interpretation, that § 1983 does not provide a cause of action against state agencies.  Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989).  That limitation applies to claims for injunctive and declaratory relief in addition to damages suits.  Komlosi v. N.Y.S. Office of Mental Retardation and Developmental Disabilities, 64 F.3d 810, 815 & 815 n.3 (2d Cir. 1995).  Claims brought for injunctive relief are properly brought against the state officials responsible for the underlying violations and enforcement of any injunction that might issue, such as Brian Fischer, Commissioner of DOCS, and Mike Hogan, Commissioner of OMH.  See Henrietta D. v. Bloomberg, 331 F.3d 261, 287-88 (2d Cir. 2003) (permitting suit against state officers in their official capacity).  The plaintiff's § 1983 claims against DOCS and OMH are dismissed.

As for the plaintiff's claim under New York state law, this too must be dismissed.[16]  This Court lacks jurisdiction to enjoin

---

[16] While the plaintiff states that he is seeking to enforce provisions of "the Mental Health Hygiene Law passed in 2008" providing for the mandatory training of corrections officers in close contact with mentally ill inmates, it is likely that he is in fact seeking to enforce New York's Correction Law, which provides:

state officials to comply with state law.  Pennhurst State

School & Hosp. v. Haldeman, 465 U.S. 89, 121 (1984).

Title II of the ADA "proscribes discrimination against the

disabled in access to public services."  Harris v. Mills, 572

F.3d 66, 73 (2d Cir. 2009) (citation omitted).  It provides that

"no qualified individual with a disability shall, by reason of

such disability, be excluded from participation in or be denied

the benefits of the services, programs, or activities of a

public entity, or be subjected to discrimination by any such

entity."  Id. (citing 42 U.S.C. § 12132).  "To assure those

requirements are met, 'reasonable accommodation' may have to be

provided to the qualified individual."  Harris, 572 F.3d at 73

(citation omitted).  To state a prima facie claim under Title II

---

The [DOCS] shall ensure that the curriculum for new
correction officers, and other new department staff
who will regularly work in programs providing mental
health treatment for inmates, shall include at least
eight hours of training about the types and symptoms
of mental illnesses, the goals of mental health
treatment, the prevention of suicide and training in
how to effectively and safely manage inmates with
mental illness.  Such training may be provided by
the office of mental health or the New York state
commission on quality of care and advocacy for
persons with disabilities.  All department staff who
are transferring into a residential mental health
treatment unit shall receive a minimum of eight
additional hours of such training, and eight hours
of annual training as long as they work in such a
unit.  The department shall provide additional
training on these topics on an ongoing basis as it
deems appropriate.

N.Y. Corr. L. § 401.6.

of the ADA, a plaintiff must allege: "(1) that he is a 'qualified individual' with a disability; (2) that he was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by a public entity; and (3) that such exclusion or discrimination was due to his disability." Fulton v. Goord, 591 F.3d 37, 43 (2d Cir. 2009) (citation omitted).  A plaintiff may bring suit against a state agency to enjoin continuing violations of the ADA.  See, e.g., Conroy v. N.Y.S. Dept. of Correctional Services, 333 F.3d 88, 94 (2d Cir. 2003); see also United States v. Georgia, 546 U.S. 151, 159 (2006) (Title II of ADA is valid congressional abrogation of state sovereign immunity).

The defendants' motion to dismiss is denied with respect to the plaintiff's ADA claim.  Liberally construing the complaint, the plaintiff alleges that, by virtue of their disabilities, he and other mental health inmates are targets of opportunity for corrections officers guarding his cellblock.  He further alleges that it is the failure of the relevant state agencies, DOCS and OMH, to train and supervise corrections officers in the handling of mentally ill patients that has perpetuated this state of affairs.  This is sufficient to state a claim under the ADA against DOCS and OMH.[17]

---

[17] The defendants argue that the claim should be dismissed at least as to OMH because it lacks authority over corrections

## Conclusion

The defendants have not moved to dismiss on the merits the
plaintiff's claims that he was assaulted by Wesley and Hannaman
on June 18, 2010, and his Kosher meals were confiscated by
Thorpe from July 31 until at least August 23, 2010.  Because
these claims had been exhausted prior to the deadline the
plaintiff was given to file his amended complaint, they are
deemed exhausted and survive.  The defendants' motion to dismiss
is granted with respect to all other claims against the
individual defendants.  The Clerk of Court shall remove Gunsett
and Lambert as defendants from this case.  As for the agency
defendants, the motion to dismiss is granted on the plaintiff's
§ 1983 and pendent state law claims against DOCS and OMH, but
denied as to the ADA claim.

SO ORDERED:

Dated:    New York, New York
          December 6, 2011

                                    DENISE COTE
                          United States District Judge

---

officers.  The Correction Law, however, is clear that the DOCS
and OMH commissioners share "joint responsibility" over programs
established in state prisons for the treatment and supervision
of mentally ill inmates.  N.Y. Corr. L. § 401.1.  These programs
include the training of corrections officers.  Id. § 401.6.

35

COPIES SENT TO:

Daniel Castro-Sanchez
04-A-3037
Green Haven Correctional Facility
P.O. Box 4000
Stormville, NY 12582

Steven N. Schulman
Assistant Attorney General
State of New York Office of the
Attorney General
120 Broadway
New York, NY 10271